UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| COGENT MEDICINE, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>ELSEVIER INC.,<br><br>    Defendant. | Case Nos. C-13-4479-RMW, -4483, -4486<br><br>**ORDER GRANTING MOTION TO DISMISS** |
| COGENT MEDICINE, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>JOHN WILEY & SONS, INC. AND JOHN WILEY & SONS LTD.,<br><br>    Defendants. | |
| COGENT MEDICINE, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>PHYSICIANS INTERACTIVE HOLDINGS, INC., PHYSICIANS INTERACTIVE, INC., AND SKYSCAPE.COM, INC.,<br><br>    Defendants. | |

ORDER GRANTING MOTION TO DISMISS
Case Nos. C-13-4479-RMW, -4483, -4486          - 1 -
RDS

Defendants Elsevier, Inc. ("Elsevier") and John Wiley & Sons, Inc. and John Wiley & Sons Ltd. (collectively, "John Wiley") move to dismiss plaintiff Cogent Medicine, Inc.'s ("Cogent") complaint. Defendants argue that all claims of the asserted patent, U.S. Patent No. 7,133,879 ("the '879 Patent") are invalid for failure to claim patent-eligible subject matter. For the reasons explained below, the court GRANTS the motion.

## I.  BACKGROUND

Cogent asserts that Elsevier, John Wiley, and Physicians Interactive Holdings, Inc., Physicians Interactive, Inc., and Skyscape.com, Inc. infringe the '879 Patent, titled "Personalized Library Interface for Providing Data to a User." *See* '879 Patent. The '879 Patent describes a database of medical resources that is searchable via a library interface. *See, e.g.*, *id*. at 1:22-58. The '879 Patent also refers to "preselected data," which includes information selected by an editor, expert, or advertiser. *Id*. at 1:54-58. The detailed description section summarizes the alleged invention succinctly:

> The invention provides access to one or more databases to a user. The user can select areas of interest and store searches to be performed on the databases. Additionally, the user can access data selections made by an entity other than the user. For example, the user can request data selections regarding a specified topic made by an expert in that topic. The user can request data selections made by an advertiser.

*Id*. at 2:27-33.

The bulk of the remainder of the '879 Patent's specification is dedicated to discussing the "library interface," which principally comprises a set of electronic folders. In one embodiment, the library interface is organized by medical affliction, with a different folder for each disease, illness, or injury. *See* '879 Patent at 2:54-65. Each of these folders in turn holds several sub-folders, such as "a new-citations folder, saved-folder, all-citations folder, and editor's-choice folder . . . ." *Id*. at 2:56-57 (figure references omitted). When a user opens one of these sub-folders, the alleged invention runs various preset search strategies on the database, automatically updating that folder with the latest information. *Id*. at 2:66-3:6. For example, Figure 1 of the '879 Patent depicts a broad "Lung and Mediastinum" folder, having sub-folders entitled "HSCLCa" ("non-small cell lung

cancer")[1] and "SCLCa" (small-cell lung cancer). *Id*. at 2:54-65. Each of these sub-folders has four folders, such that when a doctor or researcher opens the folder, the alleged invention returns the most recent search results corresponding with that folder. *Id*. at 2:66-3:18.

The '879 Patent includes 17 method claims, 2 system claims, and 2 claims to "[a]t least one of an operating system, a computer-readable medium having stored thereon a plurality of computer-executable instructions, a co-processing device, and, a computing device." *See* '879 Patent claims. Claim 1, which is representative of the other claims, recites:

> A method for providing data to a user from one or more data sets, said method comprising:
>
> accepting from a user and storing one or more search strategies directed to medical literature in data folders wherein said storage is for repeat use by a user, each of said one or more search strategies associated with one or more of said one or more data sets; and
>
> accepting from said user a request to view medical information, and, based on said request, selectively providing data set information in said data folders comprising preselected medical information for said user or users from said one or more data sets, said medical information having been preselected and placed in said folder by a specialist for said user or users and
>
> at least one of (a) medical information from said one or more associated data sets corresponding to one of said search strategies directed to medical literature wherein said medical information is added to the said one or more data sets since the last time said user accessed said one or more associated data sets; or (b) medical information corresponding to one of said search strategies directed to medical literature wherein said medical information is not limited in time.

*Id*. claim 1.

Cogent filed the complaint in all three cases on September 27, 2013. *See, e.g.*, Case No. 13-4479, Dkt. No. 1.[2] Defendants Elsevier and John Wiley ("moving defendants") filed the instant motions to dismiss on January 27, 2014. *See, e.g.*, Dkt. No. 17 ("Mot."). In December 2013, however, the Supreme Court granted certiorari in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, *see* 134 S. Ct. 734 (2013), a case directly relevant to deciding the present motions, so the court elected to stay

---

[1] The specification refers to the "HSCLCa" folder as the "NSCLCa" folder, so "HSCLCa" in the figure may be a typo. '879 Patent at 2:58.
[2] Except where otherwise noted, all citations to a docket number refer to case number 13-CV-4479.

ORDER GRANTING MOTION TO DISMISS
Case Nos. C-13-4479-RMW, -4483, -4486       - 3 -
RDS

the present cases pending resolution of *Alice*. *See, e.g.*, Dkt. No. 37. Since *Alice* was decided on June 19, 2014, *see* 134 S. Ct. 2347, both Cogent and the moving defendants filed supplemental briefing, *see* Dkt. Nos. 43, 44, 45.

## II. ANALYSIS

### A. Legal Standard

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In considering whether the complaint is sufficient to state a claim, the Court must accept as true all of the factual allegations contained in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, the Court need not accept as true "allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). While a complaint need not allege detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### B. Motion to Dismiss

As an initial matter, Cogent argues that this court should not consider the patentable subject matter issue before claim construction. In response, the moving defendants cite *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338-40 (Fed. Circ. 2013) *cert. granted, judgment vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014) for the proposition that whether a claim recites patent-eligible subject matter is a question of law that may be resolved on a motion to dismiss. "Although *Ultramercial* has since been vacated by the Supreme Court, [the Federal Circuit] perceive[s] no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,

687 F.3d 1266, 1273 (Fed. Cir. 2012). However, in *Bancorp* the Federal Circuit also reaffirmed "that it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Id*. at 1273-74. Here, the court finds that claim construction is not necessary to determine whether the '879 Patent claims patent-eligible subject matter. The court thus declines to delay resolution of the § 101 issue. *See Compression Tech. Solutions LLC v. EMC Corp.*, 12-CV-01746 RMW, 2013 WL 2368039 (N.D. Cal. May 29, 2013), *aff'd*, 557 F. App'x 1001 (Fed. Cir. 2014) (granting a motion for summary judgment of invalidity under § 101 prior to claim construction); *see also I/P Engine, Inc. v. AOL Inc.*, __ Fed. App'x. __, 2014 WL 3973501, at *9 (Fed. Cir. Aug. 15, 2014) (Mayer, J., concurring) (arguing that subject matter eligibility should have been decided at the outset of the case to avoid "unnecessary litigation, and nearly two weeks of trial and imposition on citizen jurors").

Section 101 of the Patent Act describes the types of inventions that are eligible for patent protection. Specifically, § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. Section 101 has long contained "an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013) (brackets omitted) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012)). In *Alice*, the Supreme Court articulated that "the concern that drives this exclusionary principle [is] one of pre-emption." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). "Monopolization of [laws of nature, natural phenomena, and abstract ideas] through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id*. (quoting *Mayo*, 132 S. Ct. at 1293). However, the Supreme Court has also recognized the need to "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id*.

"Applications of [abstract] concepts to a new and useful end . . . remain eligible for patent protection." *Id*. (internal quotations omitted).

*Mayo* "set[s] forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, the court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id*. If the court finds that the patent claim recites a patent-ineligible abstract idea, the court then must "consider the elements of each claim both individually and as an ordered combination to determine whether the [elements in addition to the abstract idea] transform[s] the nature of the claim into a patent-eligible application." *Id*. In this step, the court "must examine the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Id*. at 2357.

The court therefore first looks to whether the '879 Patent's claims recite an abstract idea. In the initial briefing, the moving defendants argued that the '879 Patent embodies the abstract idea of "providing users with a personal library interface containing medical literature." Mot. at 11. The reply and supplemental brief identify the abstract idea as "organizing and presenting information to a user according to the user's preferences." Dkt. No. 24 ("Reply") at 3; Dkt. No. 43 ("Def. Supp. Br.") at 2. Cogent responds that the '879 Patent claims much narrower subject matter than the moving defendants describe.

The court finds that the '879 Patent claims the abstract idea of maintaining and searching a library of information. Given a database of information, the alleged invention catalogues the information and sets aside particular information that may be especially relevant based on the particular user. This idea is little different than the basic concept of organizing a physical library so that an individual can search for information by going to the relevant portion of the library and picking a book. Should someone want preselected books, she can ask a librarian.

In the medical field, the alleged invention is akin to the longstanding practice of keeping an updated set of folders for supplying doctors with the latest medical knowledge. Prior to the alleged invention, if a doctor wished to read about small-cell lung cancer, he would locate the folder

1    corresponding to small-cell lung cancer and study the articles therein. An assistant would preferably

2    keep the folder up to date with the latest articles, including those from experts or advertisers. The

3    '879 Patent describes a computerized method of performing the same task.

4          Turning to the second step of the *Mayo* methodology, the court considers that "[a]bstract

5    ideas may still be patent-eligible if they contain an inventive concept sufficient to transform the

6    claimed abstract idea into a patent-eligible application." *Planet Bingo, LLC v. VKGS LLC*, No.

7    2013-1663, ___ Fed. App'x. ___, 2014 WL 4195188, at *3 (Fed. Cir. Aug. 26, 2014) (quoting *Alice*,

8    134 S. Ct. at 2357; *Mayo*, 132 S. Ct. at 1294, 1298). On this issue, Cogent presents two arguments:

9    (1) the so-called "enhanced interface" is an inventive contribution to the prior art, and (2) the claims

10   limit use of the abstract idea to the medical field. The court addresses each in turn.

11         First, Cogent refers to an "enhanced interface" as an inventive feature of the '879 Patent that

12   renders the subject matter patentable. Cogent explains that the '879 Patent adds "the novel

13   contribution of an automated search and matching function that identifies and supplies new medical

14   literature, based on common ground between prior search strategies and new medical literature

15   selected by specialists." Dkt. No. 44, at 4. However, these method steps are equivalent to those

16   already discussed as insufficient to confer patent eligibility—using a computer to identify and

17   supply new medical literature merely automates what was previously done manually by assistants or

18   librarians.

19         Cogent insists that its claims are patent-eligible "because [they] require[] more than simply

20   re-running a prior search. The enhanced interface provides related materials and concepts (i.e.,

21   preselected medical information) that are not literally within the search terms utilized by the user."

22   *Id*. at 4-5. But, even if Cogent is right that no previous software system implemented a similar

23   feature,[3] the court need only consider the resourcefulness of the human mind in manually

---

[3] It is important to distinguish novelty and obviousness from the "inventive feature" inquiry required by the Supreme Court in *Alice*. To be novel, a patent claim must include an element not present in the prior art. *See* 35 U.S.C. § 102. By contrast, the inventive feature question concerns whether the patent adds something to the abstract idea that is "integral to the claimed invention . . . ." *Bancorp*, 687 F.3d at 1278. The "inventive feature" language is similar to language used in discussing anticipation and obviousness under 35 U.S.C. §§ 102 or 103. However, in the context of § 101, "inventive feature" is better understood as referring to the abstract idea doctrine's prohibition on patenting fundamental truths, whether or not the fundamental truth was recently discovered. *Alice*,

preselecting medical information that is not literally within the search terms supplied by the user. In fact, it appears that much of the preselecting described by the '879 Patent is done manually, by an "editor," a "specialist," or an "advertiser." '879 Patent at 4:9-33. Therefore, using the constructions most favorable to Cogent, the '879 Patent claims no more than a computer automation of what "can be performed in the human mind, or by a human using a pen and paper." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011). These methods, "which are the equivalent of human mental work, are unpatentable abstract ideas." *Id.* at 1371.

Second, Cogent argues that the '879 Patent's claims do not preempt use of the abstract idea because they are expressly limited to the medical field. The Supreme Court in *Alice* articulated that the primary concern driving the abstract ideas exception to § 101 is "one of pre-emption." *Alice*, 134 S. Ct. at 2354. However, a bare field of use limitation, without more, cannot make an otherwise abstract claim patent-eligible. A field of use limitation—such as the '879 Patent's limitation to the medical field—still allows the patentee to preempt use of the abstract idea in that entire field. Preventing preemption of the entire abstract idea, even in a small field, is consistent with the Supreme Court's "repeated[] concern that patent law not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity." *Id.* (quoting *Mayo*, 132 S. Ct. at 1301).

Moreover, restricting the abstract idea to a particular field is not an inventive application of an abstract idea as contemplated by *Alice*. Rather "than simply stating the abstract idea while adding the words 'apply it,'" the patent claims must sufficiently combine an "inventive concept" with the abstract idea such that the abstract idea is transformed into a patent-eligible application. *Id.* at 2357

---

134 S. Ct. at 2357 (discussing *Gottschalk v. Benson*, 409 U.S. 63 (1972): "Because the algorithm was an abstract idea, the claim had to supply a 'new and useful' application of the idea in order to be patent eligible. But the computer implementation did not supply the necessary inventive concept; the process could be 'carried out in existing computers long in use.'") (quoting *Benson*, 407 U.S. at 67). The addition of a conventional element like a generic computer to an abstract idea does not add an "inventive feature" to the abstract idea, and thus the claim is unpatentable under § 101. Therefore, while the patent at issue in this case is invalid under § 101, in other cases it is important not to overly impute into § 101 considerations reserved for challenges under §§ 102, 103, or, if the patent claims subject matter broader than its disclosure, § 112. *See Mayo*, 132 S. Ct. at 1303-04 (explaining that, while there is often overlap, each of the Patent Act's provisions, including § 101, plays a separate role with respect to patent eligibility).

1  (quoting *Mayo*, 132 S. Ct. at 1294, 1298). In other words, there must be some addition to the

2  abstract idea that is "integral to the claimed invention . . . ." *Bancorp*, 687 F.3d at 1278. The '879

3  Patent's limitation to the medical field is not such an integral addition. *Alice*, 134 S. Ct. at 1258

4  ("[L]imiting the use of an abstract idea 'to a particular technological environment'" "is not enough

5  for patent eligibility.") (quoting *Bilski*, 130 S. Ct. at 3230).

6        Furthermore, the Supreme Court has consistently expressed the concern that patent

7  eligibility not "depend simply on the draftsman's art." *Id*. at 2359 (quoting *Parker v. Flook*, 437

8  U.S. 584, 593 (1978)). Allowing a field of use limitation to confer patent eligibility would create

9  exactly that sort of dependence—a skilled patent drafter could craft a set of claims that together

10  preempt an entire abstract idea by limiting each individual claim to a specific field. This loophole

11  would not even be difficult to exploit, as a single patent could likely preempt the use of an entire

12  abstract idea by including a separate claim for each field, so long as each field is sufficiently

13  described in the specification as required by 35 U.S.C. § 112.

14        Additionally, while "[t]he machine-or-transformation test is not the sole test for deciding

15  whether an invention is a patent-eligible 'process,'" it is still "a useful and important clue." *Bilski v.*

16  *Kappos*, 130 S. Ct. 3218, 3227 (2010). Here, the transformation prong is inapplicable and the

17  claimed methods are not tied to any particular machine. As to the machine prong, the method steps

18  assume the existence of a computer, but the claims do not recite a computer. To the extent that a

19  computer can be imputed into the claims, it is a general purpose computer. "[T]he mere recitation of

20  a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible

21  invention." *Alice*, 134 S. Ct. at 1258. Instead, to confer patent eligibility on a claim, the computer

22  "must play a significant part in permitting the claimed method to be performed, rather than function

23  solely as an obvious mechanism for permitting a solution to be achieved more quickly . . . ." *SiRF*

24  *Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010). Here, as has been

25  discussed above, the computer does no more than automate what "can be done mentally." *Benson*,

26  409 U.S. at 67. Therefore, the machine-or-transformation test confirms that the '879 Patent's

27  method claims do not claim patentable subject matter.

28

ORDER GRANTING MOTION TO DISMISS
Case Nos. C-13-4479-RMW, -4483, -4486    - 9 -
RDS

Finally, *Alice* makes clear that the '879 Patent's system and computer component claims rise and fall with the method claims. "[N]one of the hardware recited by the system [or computer component] claims offers a meaningful limitation beyond generally linking the use of the [method] to a particular technological environment, that is, implementation via computers." *Alice*, 134 S. Ct. at 2360 (internal quotations omitted, [method] alteration in original). "Put another way, the system claims are no different from the method claims in substance. The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea." *Id*. Because the system and computer component claims "add nothing of substance to the underlying abstract idea," they also fail to claim patent-eligible subject matter required by § 101. *Id*.

In sum, under the second step of the *Mayo* methodology, "the claims at issue do not have an 'inventive concept' sufficient to 'transform' the claimed subject matter into a patent-eligible application." *Planet Bingo*, 2014 WL 4195188, at *3. Accordingly, all claims of the '879 Patent are invalid for failure to claim patentable subject matter under § 101. Therefore, the moving defendants' motion to dismiss is GRANTED.

### III.  ORDER

For the foregoing reasons, Elsevier and John Wiley's Motion to Dismiss is GRANTED.

Dated: September 30, 2014

*/s/ Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge